```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

VINCENT C. DANIELS,              )
          Plaintiff,             )
                                 )
     v.                          )    C.A. No. 13-11551-MLW
                                 )
RAYMOURS FURNITURE               )
COMPANY, INC., d/b/a             )
RAYMOUR & FLANIGAN COMPANY,      )
          Defendant.             )


<u>MEMORANDUM AND ORDER</u>

WOLF, D.J.                                         March 31, 2014

I.   INTRODUCTION

   Plaintiff Vincent C. Daniels brought this action in the Bristol County Superior Court of the Commonwealth of Massachusetts. Daniels makes various claims against his former employer, Raymours Furniture Co., Inc. ("Raymours"), under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, <u>et</u> <u>seq.</u>, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 <u>et</u> <u>seq.</u>, and Mass. Gen. Laws ch. 151B ("M.G.L. ch. 151B"), a state anti-discrimination law. Raymours timely removed the case to this United States District Court. Raymours subsequently filed a Motion to Dismiss and Compel Arbitration.

   Raymours argues that Daniels is barred from bringing this suit because the company's employee handbook constitutes a contract that requires arbitration of Daniels' claims under the ADA, FMLA, and M.G.L. ch. 151B, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §4. Therefore, Raymours requests that the court issue an

order compelling arbitration and dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1). Daniels opposes the motion.

For the reasons explained below, Raymours' motion to compel arbitration is meritorious and is, therefore, being allowed.

II. BACKGROUND

Daniels filed a complaint alleging that: (1) Raymours took retaliatory actions against him in violation of the FMLA (Count I); (2) Raymours subjected Daniels to material adverse conditions because of his status as a qualified person with a disability in violation of the ADA (Count II); (3) Raymours discriminated against Daniels on the basis of a handicap in violation of M.G.L. ch. 151B (Count III); (4) Raymours subjected Daniels to a hostile work environment in violation of the FMLA (Count IV); (5) Raymours subjected Daniels to a hostile work environment in violation of the ADA (Count V); (6) Raymours subjected Daniels to a hostile work environment in violation of M.G.L. ch. 151B (Count VI); Raymours took retaliatory actions against Daniels for exercising his rights under the ADA (Count VII); (8) Raymours took retaliatory actions against Daniels for requesting reasonable accommodation under M.G.L. ch. 151B (Count VIII); and (9) Daniels reasonably relied to his detriment on oral and written representations made by Raymours to him stating that he would be extended leave pursuant to the FMLA

(Count IX). See Compl. ¶¶25-76.

Daniels seeks statutory penalties pursuant to 29 U.S.C. §1132(c)(1), back pay, front pay, damages for emotional distress, compensatory and punitive damages, costs and attorney's fees, and liquidated damages as provided for under the FMLA, the ADA, and M.G.L. ch. 151B. Id. at 11.

After removing the case to this court, Raymours filed a motion to dismiss and compel arbitration, a supporting memorandum, and related evidence. The motion to compel relies upon 9 U.S.C. §4 and Federal Rule of Civil Procedure 12(b)(1).

In support of its request to compel arbitration, Raymours states that when Daniels began his employment in February 2011, he was required to review and acknowledge receipt of an Associate Handbook (the "Handbook"), which contained Raymours' employment policies. See Memo. in Supp. of Mot. to Dismiss at 2. The acknowledgment, among other things, contained Daniels' promise to become familiar with the Associate Handbook and all future revisions. Id. In January 2012, the company adopted an Employment Arbitration Program (the "Arbitration Program"), and incorporated it into the Handbook. Id. at 3. The Arbitration Program required employees to submit to arbitration any employment-related claims, including, but not limited to, claims under the ADA, FMLA, and M.G.L. ch. 151B. Id. at 3-4. The revision to the Handbook also specified that the arbitration program is an "essential element of

your continued relationship with Raymour & Flanigan and is a condition of your employment." Id. Daniels reviewed the Arbitration Program electronically, and certified that he had read it by clicking a button marked "done." Id. at 7. Raymours contends that, by acknowledging that he had read the updated version of the Handbook, Daniels entered into a contract to arbitrate his employment-related claims against Raymours.

In support of its motion, Raymours has filed: (1) an affidavit of Steve McPeak, the Vice President of Human Resources at Raymours, responsible for developing, implementing and ensuring compliance with the Associate Handbook; (2) a copy of Daniels' receipt and acknowledgment of the Associate Handbook; (3) a copy of the Information Technology Access Request Form that Daniels signed to obtain access to Raymours' systems; (4) a copy of the Arbitration Program that Raymours implemented in January 2012; (5) a copy of a February 1, 2012 email, sent by McPeak to all Raymours' employees, including Daniels, notifying them about the updated Associate Handbook and the Arbitration Program; (6) a copy of the procedures on the company's self-service portal, which helps employees with the process of accessing, reviewing, and acknowledging the updated Associate Handbook; and (7) a printout from Raymours' intranet system indicating that Daniels had accessed, reviewed, and acknowledged the updated Associate Handbook. The affidavit and other evidence support the contentions in Raymours' memorandum.

4

Daniels opposed the motion to dismiss and compel arbitration and filed an affidavit. In essence, Daniels contends that no contract to arbitrate was formed. See Memo. in Supp. of Opp. at 2. Daniels states that Raymours' assurances and actions concerning the Handbook, the document he was required to sign when he commenced employment, and McPeak's email, cause the Arbitration Program to not be part of his contract with Raymours. Id. at 3. According to Daniels, when he was first told of the Handbook he was informed, orally and in writing, that it created no contractual obligations, and that the Handbook was for informational purposes only. See Daniels Decl. ¶3. In essence, Daniels asserts that Raymours' statements and conduct render the Handbook informational rather than the terms of a contract. Id. ¶¶3-6. Accordingly, Daniels argues that he never waived his rights to a judicial forum and that the Arbitration Program does not bind him. Id. ¶8

III. DISCUSSION

"Section 4, 9 U.S.C. §4, allows a party aggrieved by another party's refusal to arbitrate to petition a district court to compel arbitration in accordance with the parties' preexisting agreement." Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st Cir. 2005).

"The 'principal purpose' of the FAA is to 'ensure that private arbitration agreements are enforced according to their terms.'"

5

AT&T Mobility, LLC v. Concepcion, 132 S. Ct. 1740, 1748 (2011) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989)).

"Whether or not a dispute is arbitrable is typically a question for judicial determination." Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011). The phrase "question of arbitrability" "includes questions of whether the parties have a valid arbitration agreement at all[.]" Fantastic Sams Franchise Corp. v. FSRO Ass'n Ltd., 683 F.3d 18, 25 (1st Cir. 2012) (citing Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 452 (2003)). "[T]he first principle that underscores all of the Supreme Court's arbitration decisions is that '[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes - but only those disputes - that the parties have agreed to submit to arbitration.'" Dialysis Access, 638 F.3d at 376 (quoting Granite Rock, 130 S. Ct. at 2857) (emphasis in original).

"A party seeking to compel arbitration must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" Campbell, 407 F.3d at 552 (quoting InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)). "[F]or the most part, general principles of state contract law control the determination of whether a valid agreement to arbitrate exists." Id. (internal

citations omitted).

In this case, the following facts are not in dispute. Raymours hired Daniels in February 2011, to work as a showroom manager. See Daniels Decl. ¶2. As a part of the hiring process, Daniels signed a number of documents, including a Receipt and Acknowledgment of Raymour & Flanigan Associate Handbook and Acknowledgment of At-Will Employment Status ("Acknowledgment of At-Will Employment Status"). Id. In the context of explaining that associates are at-will employees, the Handbook states that it is "not a contract of employment" and that it is "intended for informational purposes only." See Daniels Decl. at 4. The Acknowledgment of At-Will Employment Status also stated that Raymours reserves the right to change the policies in the Handbook, and that an associate is "responsible for becoming familiar" with the changes. See McPeak Decl. Ex. 1.

The Acknowledgment of At-Will Employment Status that Daniels signed also stated that "my continued employment constitutes my agreement that such changes apply to me." Id. In January 2012, Raymours adopted the Arbitration Program, and incorporated it into the Handbook. See McPeak Decl. Ex. 3. In the section concerning the Arbitration Program, the term "Claims" was defined to mean any compensation or employment-related disputes, controversies or actions between the employees and Raymours that are based on, but not limited to, any rights under the ADA, FMLA, and M.G.L. ch.

7

151B. Id.

On February 1, 2012, McPeak, the Vice President of Human Resources at Raymours, notified all Raymours associates that the Handbook had been updated effective January 1, 2012, and that because of the "significant updates that have been made," including the adoption of the Arbitration Program, all associates were required to acknowledge that they had reviewed the revised Handbook. See McPeak Decl. Ex. 4. The Arbitration Program that was introduced as an update, in bold type, stated that the "Program is an essential element of your continued employment relationship with Raymour and Flanigan and is a condition of your employment." See McPeak Decl. Ex. 3. On February 1, 2012, at 4:18 p.m., Daniels electronically acknowledged that he had accessed and reviewed the updated Associate Handbook and the Arbitration Program. See McPeak Decl. Ex. 6.

As Raymours seeks to compel Daniels to arbitrate his employment-related claims, it must demonstrate that: (1) Raymours and Daniels entered into a valid agreement to arbitrate; (2) Raymours is entitled to invoke the arbitration clause; (3) Daniels is bound by the clause; and (4) Daniels' claims fall within the scope of the clause. See Campbell, 407 F.3d at 552.

Raymours' Arbitration Program expressly states that it covers any employment-related disputes that are based upon any right protected by the ADA, the FMLA, and M.G.L ch. 151B. See McPeak

Decl. Ex. 3 at 3-4. Daniels does not dispute that the claims asserted by him fall within the scope of the arbitration clause. It is also not disputed that if a contract to arbitrate exists, Raymours is entitled to invoke it, and Daniels is bound by it.

Therefore, the essential question is whether a contract to arbitrate exists. As indicated earlier, "general principles of state contract law control the determination of whether a valid agreement to arbitrate exists." Campbell, 407 F.3d at 552.

In Massachusetts, it has been recognized that "[a] personnel manual may form the basis of an express contract." O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 691 (1996) (citing Jackson v. Action for Boston Cmty. Dev., Inc., 403 Mass. 8, 13 (1988)). "[T]he enforceability of an employee handbook as a contract depends on a host of considerations, including its content and the circumstances of its distribution." Campbell, 407 F.3d at 559. "If the parties agree in advance of employment that a personnel manual will set forth relative rights and obligations of employer and employee, the manual becomes part of the employment contract." O'Brien, 422 Mass. at 691. "A similar result would be obtained if, during the course of at-will employment, the parties agree, orally or in writing, that thereafter their rights and obligations would include the provisions of an employee manual." Id.

The Arbitration Program was introduced by Raymours as an update to the Handbook. The Handbook is, essentially, a manual that

9

sets forth the company's work rules, policies, and procedures. See McPeak Decl. ¶2. The Acknowledgment of At-Will Employment Status, which Daniels signed at the time he began work in 2011, stated that the Handbook contains "important information about Raymour and Flanigan's employment policies" and that associates "are expected to access and read the Handbook and familiarize [themselves] with these policies." McPeak Decl. Ex. 1. By signing the Receipt and Acknowledgment, associates expressly agreed that the policies in the Handbook applied to them. Id. Moreover, the Handbook stated that "[c]ontinuing employment after issuance of this Handbook (or any subsequent revision) constitutes the associate's agreement to rules, policies, practices and procedures contained herein or therein." Daniels Decl. at 4.

When the Handbook was updated by incorporating, among other things, the Arbitration Program, Daniels acknowledged having accessed and reviewed it. See McPeak Decl. Ex. 6. In pertinent part, the Arbitration Program stated that "[t]his program is an essential element of [the associate's] continued employment relationship with Raymour and Flanigan and is a condition of [the associate's] employment." As held in O'Brien, "[a]n employee remaining with the employer after receiving a manual provides the consideration necessary to support the contract." Id.

The totality of the circumstances, including the contents of the Handbook and the context of its communication, indicates that

10

the parties agreed in advance of employment that the Handbook sets forth the rights and obligations of the employer and employee. See O'Brien, 422 Mass. at 391. When Daniels began work in 2011, he signed a document that required him to access and read the Handbook, and to familiarize himself with any changes to it. See Daniels Decl. ¶2. The document expressly stated that the changes to the Handbook would apply to all associates, and that their continued employment constitutes the associate's agreement to the changes. See McPeak Decl. Ex. 1. In January 2012, Raymours introduced the Arbitration Program as an update to the Handbook, and Daniels acknowledged that he had reviewed the terms of the Program. See McPeak Decl. Ex. 6. The Arbitration Program also specified that the program is an essential element of the associate's continued employment relationship, and that it is a condition of employment. See McPeak Decl. Ex. 3. In these circumstances, the court finds that a reasonable employee would have believed that the employer was offering to continue his or her employment on the terms stated in the updated Handbook. See Campbell, 407 F.3d at 559. More specifically, given the contents of the Handbook and the Arbitration Program, and the context in which that information was communicated, a reasonable employee of Raymours would have known that the Handbook provided the terms of a contract to arbitrate. Id.

In O'Brien, the Supreme Judicial Court of Massachusetts (the

"SJC") further noted that "the context of the manual's preparation and distribution is, to us, the most persuasive proof that it would almost be inevitable for an employee to regard it as a binding commitment." Id. at 849 (quoting Woolley v. Hoffman-La Roche, Inc., 99 N.J. 284, 299 (1985)) (internal quotation marks omitted). In this case, Raymours consistently emphasized the importance of its Handbook, and that all associates must access and review it, including any updates. All employees were required, as a term and condition of their continued employment, to access the updated Handbook, including the Arbitration Program, and certify that they had read it. McPeak's February 1, 2012 email, expressly required all employees to acknowledge that they had reviewed the revised Handbook. See McPeak Decl. Ex. 4. In these circumstances, the court finds that the Handbook is a contract and the Arbitration Program is enforceable.

Daniels' argument that he was only asked to "acknowledge" the revised Handbook and not "agree" to it is not persuasive. See O'Brien, 422 Mass. at 693. This case is analogous to O'Brien, 422 Mass. at 693, in which the SJC held that "a finding that the terms of a personnel manual are part of an employees' contract would be supported if the employee signed the Handbook, manifested assent to it, or acknowledged understanding its terms, or if the employer called special attention to the manual." In this case, Raymours called "special attention" to the manual, including its revisions,

and Daniels also acknowledged that he had reviewed it. Therefore, the fact that Daniels did not specifically state that he was agreeing to the revisions in the Handbook is not dispositive.

Daniels further argues that the Handbook stated that it was for "informational purposes" only, and that Raymours reserved the right to unilaterally modify the contents of the Handbook without advance notice and at its sole discretion. These arguments were also presented to the SJC in O'Brien, 422 Mass. at 692-93. In an earlier decision, Jackson, 403 Mass. at 14-15, the SJC had found it significant that the employer retained the right to change unilaterally the provisions of the manual. In O'Brien, the SJC clarified that "[o]n the other hand, if an employee reasonably believed that the employer was offering to continue the employee's employment on the terms stated in the manual, the employee continuing to work after receipt of the manual would be in the nature of an acceptance of an offer of a unilateral contract and the promise would not be illusory." 422 Mass. at 692-93.[1] As explained earlier, the Handbook expressly stated that continuing employment after issuance of the Handbook, or any subsequent revision, constituted the employee's agreement to the provisions

---

[1] In O'Brien, the SJC found that the employer did not reserve the right to unilaterally change the provisions. However, in a footnote, the court observed that "[t]he annual distribution of new manuals, [...], may support the view that there was a right to change the manual that employees would reasonably understand to exist." O'Brien, 422 Mass. at 693 n.3.

contained in the Handbook, including any revisions. See Daniels Decl. at 4. Therefore, Daniels is not correct in contending that there was not a contract because Raymours reserved the right to unilaterally modify the terms of the Handbook. See id.

In Jackson, the SJC had also noted that if the manual states that it only provides guidance as to the employer's policies, it may not create any enforceable rights. 403 Mass. at 15. In O'Brien, however, the court clarified its earlier holding by observing that "other language in the manual or employment practices may demonstrate otherwise." 422 Mass. at 693. The SJC, essentially, held that even if a manual states that it is for informational purposes only, that statement is not necessarily determinative of whether the provisions of the manual create enforceable rights. Id. at 693. To decide whether the manual does create enforceable contractual rights, the court must examine all of the language in the manual or employment practices. Id. As explained earlier, the conduct of the parties, and the provisions of the Handbook, indicate that the parties agreed to bind themselves to the arbitration provisions.

In view of the foregoing, Raymours has satisfied its burden of proving the existence of a valid agreement to arbitrate that is binding on Daniels. Daniels' employment-related claims under the ADA, FMLA, and M.G.L. ch. 151B are within the scope of the arbitration agreement. Raymours is entitled to invoke the clause to

compel arbitration of the claims.

Finally, Daniels argues that it would be "inappropriate" to compel him to arbitrate his ADA claims. "When a party relies on the FAA to assert a contractual right to arbitrate a claim arising under the [ADA], the court must undertake a supplemental inquiry - one that may overlap with the standard contract analysis, but is independent of it." Campbell, 407 F.3d at 552. "That supplemental inquiry grows out of the principle that while federal statutory claims can come within an arbitration agreement that is enforceable pursuant to the FAA, some federal statutory claims may not be appropriate for arbitration." Id. "[T]he burden is on the party resisting arbitration to show (by means of statutory text, legislative history, or some inherent conflict between arbitration and the statute's purposes) that Congress, in enacting a particular statute, intended to preclude a waiver of a judicial forum for certain statutory claims." Id.

The First Circuit has held that "the text of the ADA leaves no doubt that Congress contemplated arbitral resolution of at least some claims brought thereunder." Id. at 553 (citing Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 151 (1st Cir. 1998)). "The appropriateness analysis is case-specific," id. at 554, and "hinges on whether, under the totality of the circumstances, the employer's communications to its employees afforded some 'minimal level of notice' sufficient to apprise those employees that continued

employment would effect a waiver of the right to pursue a judicial claim." Id. at 553 (quoting Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 21 (1st Cir. 2005)).

As explained earlier, the Handbook expressly stated that continuing employment after issuance of this Handbook constitutes the associate's agreement to rules, policies, practices, and procedures contained in the Handbook. Moreover, the Arbitration Program stated that the program was an essential element of the associate's continued employment relationship with Raymours & Flanigan, and was a condition of the associate's employment. Under the Arbitration Program, the term "Claims" was defined to mean any compensation or employment-related disputes, controversies or actions between the employees and Raymours that are based on, but not limited to, any rights under the ADA. See McPeak Decl. Ex. 3 at 3. McPeak's email stated that all associates were required to acknowledge that they had reviewed the updated Handbook, including the Arbitration Program. See McPeak Decl. Ex. 4. On February 1, 2012, Daniels acknowledged that he reviewed the Arbitration Program. In these circumstances, the court finds that the employer's communications afforded at least the "minimal level of notice" sufficient to apprise employees that continued employment would effect a waiver of the right to pursue a judicial claim. See Campbell, 407 F.3d at 554. More specifically, Daniels had been put on sufficient notice of the fact that his continued employment with

Raymours after the adoption of the Arbitration Program effected a waiver of his rights to litigate, rather than arbitrate, an alleged violation of his rights under the ADA. Daniels' argument that compelling arbitration of his ADA claims would be inappropriate is not persuasive.

IV. ORDER

In view of the foregoing, it is hereby ORDERED that Defendant's Motion to Dismiss and Compel Arbitration (Docket No. 5) is ALLOWED and this case is DISMISSED.

/s/ Mark L. Wolf
UNITED STATES DISTRICT JUDGE